The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez. Oyez. Oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw a 9 and give their attention where the Court is now sitting. God save the United States and this Honorable Court. Mr. Timmons? Good morning, Mr. Chief Judge. May it please the Court, Counsel. My name is Derek Tiney, and I'm here today arguing on behalf of the appellant landowners in these consolidated appeals. I am joined today by my co-counsel, Chris Johns, who will be arguing that allowing early possession through a preliminary injunction in a condemnation action under the Natural Gas Act exceeds the eminent domain power granted under that statute and is unconstitutional. I will be focusing on the District Court's legal errors in their application of the rules of equity to the mandatory injunctions at issue. The landowners respectfully request that this Court vacate those injunctions. The standard of review of the questions presented in these appeals is de novo. Although injunctions are nominally vacated for abuse of discretion, a District Court must exercise its discretion within the applicable rules of equity, and it abuses its discretion when it misapplies the preliminary injunction standards. Accordingly, this Court reviews the District Court's application of equitable rules de novo, and we have assigned error to the District Court's application of those rules, to their recognition of economic loss as irreparable harm, their failure to narrowly tailor the injunctions to the facts and circumstances of the case, to their allowance of self-inflicted injury and harm to satisfy the irreparable harm requirement, and the reliance on claims of harm that are merely possible rather than certain and likely. You maintain that the District Court didn't have authority to end this preliminary injunction that granted this immediate possession. Is that correct? We do make that argument. Why do you say they don't have authority? Didn't you read the Sage case? I certainly have, Your Honor, and Mr. Johns will be addressing the Sage issue. We would respectfully submit that the Sage opinion misconstrues the Natural Gas Act and fails to address… You mean an opinion of this Court from a previous panel of this Court that we are bound by to follow whether we like it or not? What do you want us to do? Your Honor, Mr. Johns will be addressing those questions more fully and explaining… I want you to address it because this is kind of a threshold issue to me. Certainly. You want to bring him up to argue or what? If that would be the Court's preference… I don't know. I want you to argue your case. I'm not trying to push the argument, but that's the first issue here in front of us. Certainly. I don't understand how you get around the Sage case in terms of whether the District Court has authority or not. We understand that Sage is the binding authority in the Fourth Circuit. Mr. Johns will be addressing the reasons why that opinion was incorrect. That won't help us one bit. It won't help you one bit to tell us it's incorrect. We're bound by it. What you need to tell me is how do we not be bound by it? To the extent that the panel is bound by the decision in Sage… Which is the extent. Certainly. Then I suppose what the appellant landowners would like is to persuade one of you all or the entire Court to revisit it. This takes two of us to persuade, doesn't it? True. But what I would like to address is that even if Sage is binding on this Court, the District Court still committed reversible error in their application of the injunction factors to this case. And Sage doesn't bind us there for a couple of reasons. You're saying the District Court abused its discretion. We're saying that it abused its discretion by misapplying the rules of equity to the injunctions at issue. And the reasons for that… Well, first, there is another overlying layer that I think is important for the Court to recognize when it reviews these. The Court's application of its exacting standard of review of preliminary injunctions must be even more searching in these appeals because of the mandatory nature of the injunctions at issue. Rather than preserving the status quo while the litigation proceeds, these injunctions mandated that the landowners allow Mountain Valley Pipeline to timber their forests and trench their fields before there was a final judgment in the action. Can I ask you a question about that? Certainly. You're not appealing the grant of summary judgment on the…putting to one side the Sage issue for a minute. You're not appealing the grant of summary judgment on the merits. I mean, you're not arguing that there isn't a right to take the land. Aside from the Sage argument, we are not challenging the ruling on the motion for summary judgment, nor are we saying that the district court was incorrect on the first injunction factor, which is likelihood of success on the merits. So, I mean, I get that it's a mandatory injunction, but you're not challenging the part where some…this thing is going to happen. The only question is whether it's going to happen before there's payment, before the condemnation proceedings finish and the people are paid, right? It's going to happen one way or another. Well, we would take issue with that, Your Honor, and here's why. This case is different than Sage. When you look at Sage… I really just…I am trying to get a handle on what exactly you're challenging. You're not contesting that this will happen. There will be an intrusion onto the land, correct? No, and here's why. We think that it is not fair to assume that this pipeline is going to happen, and here's why. In contrast to Sage, this pipeline's FERC certificate is subject to appeal in the D.C. Circuit. There are numerous regulatory approvals… You're just saying you might be able to play out the clock, but there's no… you don't have a legal entitlement. As a practical matter, maybe you'll be able to play out the clock if there's no preliminary injunction, but there's no legal entitlement. Your clients don't have a legal entitlement to stop the pipeline from taking their land, right? You're not contesting the grant of summary judgment. We do not contest the grant of summary judgment. So it seems to me the question is, what is the harm that comes to your clients from having their land used, intruded upon prior to the payment rather than at the time of payment? Well, Your Honor, I would not characterize it as trying to play out the clock. I think that there is substantial uncertainty as to whether Mountain Valley Pipeline is going to be able to run the gauntlet of retaining all of the federal authorities and state regulatory approvals that it's received. The condemnation proceeding tomorrow, let's just say hypothetically, it only takes one day instead of three years. They could finish it tomorrow. Your client gets paid tomorrow. They come on the land tomorrow. All of that is absolutely fine. If that were the case, if the imminent… Notwithstanding that fact that maybe they'll never be able to get the permit. Right. If the case were finished tomorrow, I suppose that would be the case. Okay. So what I'm asking you is, what is the harm that flows from the gap in time between when the intrusion on the land occurs and when the payment occurs? Normally I would think you would be arguing, look, in an eminent domain proceeding, of course there's a harm. If they take the land before they pay you, they take your house and you have nowhere to go and they haven't given you any money to buy a new house. But there's no kind of harm like that here, right? Because all the money is in the account, and if there's any inconvenience before the actual payment is made, they can draw on that money to compensate. Well, I think that assumes that the only harm from early possession would be monetary or would be recoverable in the just compensation. There are other types of harms that these landowners will experience from this early possession, and I think in the hypothetical that the eminent domain proceeding concluded tomorrow, sure, but that's not the reality of it. The reality of it is in parallel with this just compensation proceeding occurring, there are multiple appeals, some of them before this court, of the regulatory authority of MVP to a regulatory approval that MVP has to build its pipeline. For example, one of those was the permission from the United States Forest Service to construct the pipeline through the Jefferson National Forest, and this court has vacated that permission. As a result of that vacature, the Mountain Valley Pipeline has now been ordered by FERC to stop work on a 25-mile segment of pipeline that includes properties that are owned by appellants in this case. For example, the New River Conservancy is one of those landowners. It owns a conservation easement on approximately 200 acres of land that abuts the Jefferson National Forest. The pipeline cannot go onto their property and do any construction now. New River Conservancy's president testified at trial about the nature of the harm from the timing here. New River Conservancy doesn't own that property or own its conservation easement for any pecuniary interest. Its interests are purely to preserve the ecological environmental resources there, and there is a value in the timing of the destruction of those resources, the timing of the timbering of those forests, the timing of the destruction of those streams, in that every season that those resources remain available for the wildlife, they serve the mission of the New River Conservancy. And that sort of harm is not going to be compensable by the just compensation at the end of the day. And so by discounting the harms, there is a question of the timing of the harms here that was not present in SAGE because in SAGE there was no argument that the pipeline was a done deal and was going to be built. We challenged the basic premise that this thing is ultimately going to happen. We think there's too much uncertainty to make that assumption. It just seems like what you're really challenging is the underlying rule that the right to exercise eminent domain attaches as soon as you get the first certificate, notwithstanding the fact that all kinds of things might happen after that and prevent the pipeline from being built. But you're saying you're not challenging that rule. The grant of summary judgment is fine, notwithstanding the fact that there are all these ongoing legal proceedings. Well, it is true that we have not assigned error to the summary judgment, but you have to understand that this early possession order was issued under Rule 65. It is a preliminary injunction, and SAGE even says that you have to satisfy the elements of the injunction in order to get this early possession. You must meet those injunction standards. And our argument is, well, if that's the case, then MVP needs to be held to strict proof of irreparable harm, and we don't believe that it has shown that in these cases. Its harm primarily that it argued was that it was going to experience economic losses from a delay in early possession. But it admitted at trial that the losses that it predicted were not likely to come about. The other important thing to remember about the schedule that they were trying to adhere to was this schedule that they were trying to adhere to was their preferred schedule. This schedule targeted an in-service date of late 2018. That schedule was not mandated by any federal agency. Under the FERC certificate, they had until October 13, 2020, to put their pipeline in service. They had additional time. There was no rush. Do you feel they could meet that deadline without a preliminary injunction? They admitted so. They admitted that they could comply with that deadline if they had early possession as late as November 2018. But that would require a preliminary injunction, right? No one thinks this condemnation proceeding can wrap up by November 2018, do they? I think that's unlikely. I think no one would think that that's it. It would take about three years. And so without a preliminary injunction, they can't meet the first deadline. But they didn't ask for a preliminary injunction that would give them access in November 2018. And this brings us to our argument that the district courts failed to tailor their injunctions to the facts and circumstances of this case. And in this case, it's like this court's opinion in direct Israel versus breakthrough industries. And that was a case involving two competing medical technologies developers. One of them accused the other of developing its product through the theft of trade secrets. And they asked the district court to enjoin the sale of its competitor's project in the world marketplace and in the U.S. marketplace. Well, in response, the defendants said, we can't sell our product anywhere right now. We can't get it through customs to sell it worldwide. We can't sell it in the U.S. market because we don't yet have FDA approval. And the court acknowledged, okay, they did not show immediate harm in that case. The appellate court reversed the district court because the irreparable harm that was shown was not immediate. And they acknowledged that at some point in the course of the litigation, they may get the customs approval. They may get the FDA approval. There may come a need for a preliminary injunction at some point in the proceedings. That need was not in February of 2018 in these cases. That need, if it would arise at all, wouldn't arise until at least November 2018. So in this case, there's kind of a false dilemma of thinking, do they need early possession right now in February 2018, or must they wait until the end of trial? There's a middle ground. And we submit that this court's cases and the Supreme Court case law suggest that the injunction must be tailored to the facts of the case. And in this case, they could have constructed the pipeline with access later than February 2018. That's the motion they presented. We need access by February 2018. That's the evidence that we responded to, and we respectfully submit that we demonstrated that they weren't going to need access that early, that they could build a pipeline with a later injunction. The proper course would have been for the district courts to either deny the injunction for failure to show immediate irreparable harm or to issue an injunction that was tailored to the facts of this case. It didn't do so. Now, on remand, or perhaps if the district courts had denied, they should have issued a denial without prejudice to allow the pipeline company to come and show at a later time, all right, now we know what the date is that we're going to show irreparable harm. Give us early possession by that date. Here's our proof of irreparable harm. That's not what happened. The district court relied on this false dilemma between it's either possession now or at the end of trial when there was a middle ground that should have been pursued under this court's cases and under the Supreme Court's cases. Is the appeal from FERC decision, did you say that's going to the D.C. Court of Appeals? Yes. That is currently pending in the D.C. Circuit. The Natural Gas Act places jurisdiction of appeals of the FERC certificate. There's a choice of venue. This is about condemnation proceeding and it's going through the district court. That's correct. And the issue that you focused on here is the irreparable harm. That's correct. That MVP failed to show irreparable harm that would occur to it if it did not obtain access. What about the Hughes exception? The Hughes exception doesn't apply here. The Hughes exception recognizes that economic loss can be irreparable harm if it is unrecoverable, but that's if there's already some action against the defendant or there's some chance that either the, in fact, in Hughes, it had to do with whether or not the plaintiff was going to survive or cease to exist. We submit that for economic losses under the cases of this court and those of the D.C. Circuit, economic losses can only be irreparable injury in the event that they threaten the existence of the business. Here, MVP admitted that it would survive to construct its pipeline, even if it didn't have immediate access by February 2018. I'll make sure I've got these facts right. Isn't this about there's an endangered animal and you can only work certain times of the year, and that's another reason they say they can't delay? Certainly, Your Honor. I have gone over my time. I'd like to address your question. The reason that they asserted that they needed early possession by February 1st is they said it was bats. It was endangered bats. Some of these miles of pipeline are in bat country. There were decisions on that that dealt with endangered species, and they say you can only operate in that window there. Otherwise, they wouldn't be able to work outside of that window of time period. Your Honor is absolutely correct. There is a window of time that they are restricted to tree felling in order to protect those bats, and we're not maintaining that those bats wouldn't be harmed by tree felling outside that window. What we are saying is when MVP submitted a sworn declaration that it had to cut all the trees by March 31st, 2018, that was not the whole story because that window would reopen in November 2018, and they could cut the trees at that time. So they didn't need to complete it by March 31st of 2018. They could begin the tree felling in November 2018 and still comply with their FERC certificate. MVP's witness admitted that there were schedules that MVP designed that would comply with the endangered species regulations, would comply with the deadline in the FERC certificate, and would comply with their shipping contracts if they began construction and tree felling when the tree felling window reopened in November 2018. Counselor, I haven't checked, but I assume when I go back, I will see that this argument, a preliminary injunction should issue in November 2018. That's an argument that you made to the district court? Yes, we argued that they would not have harm until November 2018. At that point, you could issue a preliminary injunction then. Okay. Very good. Thank you, Your Honors. Mr. Johns will address the SAGE issue. Thank you. Mr. Johns? Good morning, Mr. Chief Judge. May it please the Court. I'd like to answer Judge Wynn's question, what do we do about SAGE? In other words, how are you going to get us to go en banc on it? That's what I'd like to persuade the Court to do. And I think there are three reasons. The SAGE judge panel can't take it en banc. It has to be a vote of the whole Court. We're aware of that. I think, though, if there's an issue, if there's real concern expressed by members of the panel about the decision of a previous panel, then that helps when we're trying to convince the en banc court to take the case. Did you already seek en banc? Didn't you seek an initial en banc? We did. And that was denied. That was denied. And depending on what this Court does, I would guess that we'd ask for en banc review at that point. So we absolutely want to persuade members of the Court that there are constitutional issues, statutory issues that they could consider. I'd like to talk about that. A second reason why we don't think SAGE has the force that it had before is it was decided, the entire opinion was written about the four factors, but it was analyzed under Blackwelder, which is before the Supreme Court's decision in winter and this Court's decision in The Truth About Obama. And the entire analysis was done under a completely different standard. We always hope that there's an opportunity for the judges to uphold the Constitution. We think that's what is required in this case to uphold the Constitution, is to vacate these injunctions because they violate both separation of powers and exceed the Court's authority under the Rules Enabling Act. And I'd like to, if I could, address both of those points right now, unless Your Honor has another follow-up question on that. Go ahead. Only Congress has the power to decide the method, manner, and mode of condemnation. And Congress, under Kirby Forest, the Supreme Court explained that Congress is blessed only three methods. One is direct take, a direct condemnation when Congress looks at a particular piece of land and says there's an imminent threat to that land and it passes a special law allowing a quick take and allows for payment later. Second is a quick take where it actually passes an explicit statute, and the Declaration of Takings Act would be an example that allows the federal government to do quick take. And otherwise, under Kirby Forest, it says when Congress hasn't used those extraordinary remedies of allowing, giving special authorization for takings before payment, then the ordinary rule, straight condemnation applies, where we wait until the end of the just compensation trial, payment's made, and at that point the taker has an option, only an option to then buy the property at that judicially determined price. And that's the extraordinary powers of quick take and direct takings. Only Congress can do that, but the judiciary has created a fourth option, which is for the pipeline companies, and it's only pipeline companies, by the way. We're not aware of a single other industry that gets this kind of special treatment. They run to the district courts and say we've got a FERC certificate. We need quick entry right now. We need to get onto the land immediately. Why are the FERC certificates so quick? How come they're only good for three years? Wouldn't this whole problem go away if they gave them five years? You know, I think if courts started ruling that we need to follow the ordinary rules of condemnation, then I think FERC would adjust how it deals with pipeline companies. This is a genuine question. I have no idea why it's three years. Do you? I really don't. I don't. It's a practice that's just developed, I think, in the last 15 to 20 years. In other words, no court has ruled that way. Excuse me, Your Honor? No court has ruled in that manner. No. I'm not aware of any court that's ruled saying it has to be three years. Right. And, you know, it's really troubling because until Congress has spoken, silence is negation in the context of eminent domain. In case after case from the Supreme Court in Carmack, City of Cincinnati v. Vester, Western Union, Green v. Biddle, National Railroad, the Supreme Court has repeatedly said that the powers conferred on so that they're read in favor of the landowners, and that they do not confer sovereign powers that aren't explicitly listed or necessarily implied in the statute, and that would include these quick takes. The right outcome is for the court, and whether this panel is able to do so or whether it's the en banc court, the right result is for the court to look at that constitutional problem and avoid the constitutional problem under the constitutional avoidance canon and say we're going to interpret the NGA as not allowing quick takes. There's another problem with SAGE. If this court wants to look at that or if it goes to en banc or expresses concern is that under Kirby Forrest, in the absence of a quick take statute, we wait until the end of the just compensation trial. We make the condom or pay first and take later, and that's why the Seventh Circuit in Northern Border invalidated a Rule 65 injunction saying that both under the rules of equity and under the Rules Enabling Act, courts are not allowed to invent substantive rights, and they said the condom or might have the power to take, but it doesn't have the power to take right now, and those last two words right now were put in emphasis in italics. So SAGE, in contrast, says that timing doesn't matter. You can take first and pay later, and it says that timing is not substantive, but as a property law professor that hurts my heart, I hope that our law students understand that the timing of possession is always substantive. If you think about a lease, if I have a lease that starts in February, I can't kick out the current tenant today. If I've got a fee simple subject to a life estate, I can't kick out the life tenant today. That's because you're not under the statute. The statute is different. The NGA? Yes. The NGA, and the NGA is silent, and the Supreme Court has said silence in the context of eminent domain is negation. You don't get any more sovereign rights than what the statute gives you, and so in this case, what the condomor is received is an option. That's what Kirby Forrest says, and so if I've got an option to buy your house at some future point, say December, I can't run to a court and say, well, I'd really like the current owners out by October 1st. I'm going to eventually be able to take that. I want them out right now. I want possession immediately. A court would never do that, or a court should never do that, and you better believe that losing possession is important to these landowners. It's substantive to them, and it makes a difference to them. Many of these property owners are farmers. They're small business owners. I guarantee that when it comes to the eminent domain process, MVP is going to argue that lost farm profits, lost business profits, are unrecoverable under the eminent domain statutes, and therefore losing possession now versus losing it in one year or two years or three years from now, you better believe that's substantive. I feel that I'm not framing my question right, and I'm genuinely confused about that. Is that the question, whether there's a substantive harm from losing now versus three years from now? I thought the question would be, is there a substantive harm from losing before you get the money? That's the question. Is this gap in time between the taking and the paying? Is there some harm because you are not paid at the same time that you lose your property? Like if you had to move and you didn't have money to buy a new house, that would be a harm that stems from the preliminary part of preliminary injunction and not from the injunction part. Do you see what I'm saying? I'll see if I do. Possession, you already, that's going to happen. You're going to lose possession. We're going to lose possession. So you might ask, what's the harm? Judge Harris's question, you're talking about, well, you're entitled to not lose possession. You've got to keep your property. I think her question is more to what you ought to be answering. Well, I want to make sure I understand it well then. I think there are three harms that flow from this. We've talked about the first harm, which is – I totally understand that there are lots of different harms. I'm asking, what's the relevant harm? When we're considering whether a preliminary injunction should issue, isn't the harm we're looking for the harm that flows from the part where it is preliminary? Right. The only question is whether the injunction allowing access, exercise of eminent domain comes prior to the payment or coincident with the payment. So I'm looking for a harm that addresses that. Yes, Your Honor. So the first harm we've already talked about is constitutional in nature, separation of powers. The power doesn't exist. Understood. But you're saying under the preliminary injunction standard, what harm to the landowners is able to be considered? I feel like there would be an obvious harm on the face of this were it not for the fact that this money is sitting in an account. So that were there immediate need for funds because of the exercise of eminent domain, there is a fund from which the landowners can draw. Yes, Your Honor. That's the only cognizable harm here. That's not accurate, Your Honor, and I'll explain why. So the money that the MVP deposited with the district court is for the eventual payment of just compensation. And what I'm saying is that the loss of property now versus in two or three years, there are certain types. I'm sorry, that money cannot be drawn on? No, no, it's not that it can't be drawn on. It's that it's paying for a different harm. So it's paying for the ultimate award of just compensation. But within the realm of just compensation, there are certain non-compensable harms that condemnation does not allow the landowner to recover. And I think I've run out of time to answer your question, though. For example, condemn lawyers frequently offer you cannot recover lost profits. You can't recover farm income. You can't recover the loss of the fact that you've got cows that have got calves that are going out there. Some of those things are not you're going to lose a season. What does that have to do with the preliminary injunction question? It seems like that's a very good argument to make on the merits. Like we're never going to be compensated for this stuff, so therefore you should not allow the power of emancipation. Maybe that is what you're arguing. Part of what I'm arguing is that we're never going to get those. But we may never get farm income. We may never get lost profits. That's never going to be compensated in the eminent domain process. Therefore, that's a harm that should be considered at the preliminary injunction stage. And with that, Your Honors, I'll sit unless there are other questions. Thank you. Thank you, Mr. Jones. Massey? Good morning. May it please the Court. My name is Wade Massey, and Ms. Bagnell and I represent Mountain Valley Pipeline. This appeal is governed by some basic principles that have already been alluded to. One of those is that under the Natural Gas Act, certificate orders are effective when issued. Aggrieved parties can file petitions for rehearing with FERC. They can seek review in the D.C. Circuit or another appropriate court. But pending that review and pending a decision, the certificates are effective. Now, the landowners here have filed motions to stay the certificates with FERC and also with the D.C. Circuit on two separate occasions, and all of those motions have been denied. So the certificate allows for the immediate possession of the land? Not the certificate, but it does generate an immediate right to seek to condemn necessary property for the project. So that right is immediately effective upon issuance of the certificate, but it flows directly from the Natural Gas Act as opposed to a delegation from FERC. Does title pass before just compensation? Title does not pass before just compensation, but as this court recognized in SAGE, possession can be given under the standard of Rule 65. So possession is given, but not title. Title remains with the landowner. Title remains with the landowner until just compensation is paid and an order is entered transferring title. But the right to enforce a condemnation suit begins upon issuance of the certificate, and the district court's role is to enforce that. So tell me, we've had discussion back and forth, harm to the landowners, harm to Mountain Valley, and it seems to me the focus probably should be harm to Mountain Valley in terms of whether there's irreparable harm. And in this instance, the question is whether economic harm can be considered irreparable, and normally, in general cases, we say no. So why is this case different? Well, I would just start just a little bit ahead of that by saying the judge, judges here, found that there was non-economic irreparable harm as a preliminary matter. And that hasn't been addressed, but the judges found that this case obviously involves hundreds of tracts, and there is no practical way, as has been mentioned earlier, that just compensation is going to be decided, determined and decided, before the time in the FERC certificate is up. So it's going to take time to reach just compensation. Meanwhile, there is a deadline under the FERC certificate to complete construction, and if you can't even begin the construction until all just compensation is determined, then you have the same issue that was present in SAGE, and that was characterized as a non-economic harm. But to your point about economic harm, we certainly did show that as well in several categories, and the argument has been made, at least in the briefs, I haven't heard it said directly this morning, I don't think, but it's made in the briefs that economic harm is only recoverable under two conditions. They say on brief that the losses must be, economic losses must be unrecoverable, which these would be unrecoverable, there's no claim for these against anybody, against any landowner. You say because the landowners can't pay you. No, it's not that they can't pay, they're not liable for these losses. I mean, there's no claim for these losses against anyone. They occur and they would be unrecoverable. The second requirement that's been alleged is that the losses must threaten the existence of the company. In other words, unrecoverable and threaten existence. That seems to be the argument on the brief. The Hughes case doesn't say that. I mean, the Hughes case uses the word or. It says injunctive relief is appropriate where the moving party's business cannot survive absent a preliminary injunction or where damages may be unattainable. So it's one or the other. Tell me if I'm getting this right. I read Hughes and all these other cases and it sounds like we're basically saying and it makes common sense, if you can recover damages at the end of the proceeding, then it's not an irreparable harm. Obviously, it's going to be repaired at the end of the proceeding. If you can't recover the damages, it may be – wait, did I get it backwards? So far, am I right? I think so. Okay. Sometimes, even if you can recover the damages at the end of the proceeding, there might be an irreparable harm if this time lag is going to drive you out of business. If having to wait until the proceeding is over will ruin your business, we'll call that irreparable even though you could recover it hypothetically at the end. Is that all we're saying? I think that's correct, and I think that's where this line of cases comes in. If you're going to be out of business anyway, even though you can recover at the end of the case, that may be grounds for a preliminary injunction. I wanted to make sure I was getting this right because I actually have trouble with these boxes. Okay. I would also invite the Court's attention to the Hanson Brook Farm case in which the Court said injunctive relief may be awarded when monetary damages are unavailable, and the multi-channel cable case where the Court said injunctive relief may be awarded when monetary damages are difficult to ascertain or inadequate. SAGE itself, which is obviously the preeminent authority on this issue, it contains no requirement that the monetary damages threaten the existence of the company. It simply refers to significant financial harm, which was present in that case. Why do you say SAGE is preeminent authority? Well, just looking at the line up. We know it's precedent, but why is it preeminent authority? That's what you said it was. Why is that? Well, I didn't mean any special significance to that term except that it's been so widely. Words are very important, especially in oral argument, and you invite me to. I was just because you talk about when it comes to condemnation, and that's one of the things that in a Republican form of government, a constitutional government, it's one of those monarchy things that our framers decide to keep, isn't it? It's like pardoning someone, right? That's what we're talking about, isn't it? Condemnation is basically the remnants of monarchy. Well, my history goes back that far. I'm not taking it back to law school, but isn't it really? It's the monarchy that says, I want your land, and I'm going to take it from you, isn't it? Counsel, you can concede truth. Certainly, and I would want to always, but I think it is a sovereign generated authority. But when it comes to condemnation, condemnation is the death penalty in terms of property, right? We're talking about life, liberty, and property. That's the highest form. It's the death penalty because I'm going to take from you what you own because I'm the monarchy, isn't it? That's the way it works, the sovereign power, correct? Certainly, it is a taking. And therefore, in the wisdom of Congress, they didn't give you a quick take. Instead, you have to come to courts and ask for an injunction, right, in order to effectuate the quick taking, don't you? We do under SAGE. And are we acting sort of in equity when we look at injunctions and factors like that? Certainly. Right. So then we have to look at the full consequences and the circumstances of the case. And in this case, we're talking about damage to property or taking property that may have an impact on environmental questions, all of those things. So it's not just a matter of eventually this is going to happen. The question is whether or not the nation and the protection of its properties and property owners' property and all those things are factors. And those things are still moving parts, correct? FERC is challenging it in the D.C. Circuit, correct? Well, I think each court has a different role, and I think the role of the district court in this case was to enforce the certificate. Yeah, but don't you say their job was to enforce it? I thought their job was to consider whether or not you had met your burden for a preliminary injunction. Am I wrong about that? Not at all. I'm just speaking in a broader sense that I think under the Natural Gas Act, the district court jurisdiction and authority is to enforce the certificates, including the right to adjudicate condemnation cases. And I would just say I take your point about property owners having to surrender property that they obviously believe is extremely important to them, but remember also that all citizens in all nations take their property subject to some rights that it may be needed for the public good. Oh, absolutely. That's why the thing about it, the process and the procedures are part of the rights in terms of the Fifth Amendment protection. It's not just eventually it's going to happen. That's a process which normally you have to go through, and you have compensation, and you get possession, and you get title. But here we're talking about something extraordinary. And as counsel said, it's sort of in pipelines, and courts have sort of carved out or perhaps shoehorned the thinking that this is special, and as you said before, our job is to enforce it. But the job is the question, should you have it now before it plays out the procedure? And timing is important with property. Counsel is absolutely right. Timing is everything. It's next to location, location, location, and timing, timing, timing. So why is that not a part of the procedure? You have to tell the court conventionally that you ought to be able to abort that process, take it now, and then you wait at the end to get something. Isn't it normal? I agree, because what your point was, everybody has to be subject to condemnation. You're right, but everyone else gets a chance to come in the court, have the procedure play out, and it happens at the same time. You're saying we're going to disconnect the procedure where we normally wed compensation with title and do it beforehand, and your answer is, well, you're going to. It's going to happen anyway, so you may as well just enjoy it. No, the Constitution says more than that. And perhaps SAGE is not only preeminent, maybe it's wrong. Maybe it's wrong. It's not preeminent at all. Well, you made a lot of points there. Let me just make one in response. Go ahead. On the procedural part, recall that in this case, it's not just having a certificate and taking the property. It's filing a case, getting service, bringing the case, getting the motion filed, and the motion that has been filed and granted and is uncontested is a motion for a partial summary judgment on our right to do this, and it's a right to do it now. It's not a right to do it five years from now. It's a right to proceed now. We have a right to condemn now. And so the judges that considered that all granted that, and there's been no contest of it here. And I would say it was done with full procedural protections. It was done with notice. It was done with an opportunity for discovery. There were depositions. There was written discovery. There was a full evidentiary hearing in all three cases, three separate hearings, at which each party was allowed to present whatever evidence they wanted on this issue of a preliminary injunction. So in a condemnation case, the issues are really pretty narrow. I mean, there's a right to condemn, and then the only other question is just compensation. So to protect, to Judge Harris's point, to protect on the just compensation, each of these judges required evidence on what the potential damages are to the landowners, and they gave requirements for multiple deposits, that is, money actually paid into court three times or four times the amount, and a bond on top of that for two additional times. So these payments are fully and adequately secured. There's no way anyone won't be paid for possession or the taking of their property under the system, under the framework that's been generated. And it was done simply through the process of Rule 65, equity, as you alluded to, upon a showing that there would be these damages, irreparable harm, by not doing that, and by weighing that all the judges had in their opinions of that irreparable harm against the landowners' irreparable harm that you mentioned, which the district judges asked each landowner to explain, tell me now what the difference is in the harms to you now versus the harms to you if the injunction is given at a later time. Now, don't you find it interesting that all the things you talked about is that we're going to give them all of these things and make sure that they're covered and everything is there, but yet the calculus for you is that you have to show irreparable harm, isn't it? So therefore that's counterintuitive, isn't it? Because you're saying we can solve this by giving them all of these things in advance and holding them, but yet the calculus is whether or not you have proven, right, in terms of your time and what you allege is essential, and every time the goalpost gets a little further, well, we could do it there, we could do it there. I mean, the burden is on you because it's not that you come in the court and say they're covered, they're covered. They could be covered and you still wouldn't necessarily meet your irreparable harm burden, would you? Is that right? Am I wrong about that? No, you're true. That's true. Irreparable harm is one of the elements, obviously, of a preliminary injunction. And your burden. Certainly, yes. And you don't meet your burden by making sure they're covered. That's not the way it works. When you come in and say I have irreparable harm, it doesn't matter how much gold you give them in reserve and waiting in the cave once the thing is over with. The question is what do you have in terms of proving your irreparable harm? I'm not dealing with you, but your counselor is doing a fine job for your client. But I mean it's sort of turning its head upside down, sort of inverting it in terms of. Well, I didn't mean to suggest that the security decides irreparable harm. Oh, because that's what you seem to be. You're giving a litany of all those things we've covered, and I think that's exactly what the district courts have done, too. Well, you're covered. What's the problem? You've got the gold set aside. But it's not, because that's the beauty of our framers. And it says when you go around what's the normal, there's something always in the constitutional protections that say wait a minute. In the history of this nation, when somebody said something, there was always that wait a minute. You can't just move parts all the time. And there's a reason for that when the sovereignty is taking this heavy hand. And it protects not just these land owners but every citizen when we say wait a minute. If you're going to take the heavy hand, that hand better be right. It better be right on. It's not just a matter of what difference does it make, and everybody's going to have it. The question is can you do it now? And that's the question, and that's the focus of the law and the analysis. And it seems like that's been a question in the district court as to what that is and what rights and what things are important for constitutional protections in the Fifth Amendment. Go ahead. Well, I think the judges went through the correct analysis. I think they followed exactly this court's opinion in SAGE. I think they followed exactly the winner factors. They tried to do it carefully. They did it after an evidentiary hearing. They wrote detailed opinions citing their findings. Each of these judges found irreparable harm to MVP based on the testimony that was given. That's a finding. And under this court's precedence, that finding of irreparable harm is reviewed for clear error. The irreparable harm you speak of on the preliminary injunction, which there are four factors to consider. The irreparable harm here is to your client. And when you bring up harm to the landowners, are you not speaking to a different factor, the balance of hardships and the equities? I am. And I think that's where you – and I've heard these arguments. It seems like maybe you segwayed right into one to the other without differentiating. Well, I'm talking about a different factor here. But the second factor, the one that's dealing with the irreparable harm, is probably the most contentious one here because the question is you say non-economic harms exist and maybe we accept that. You say we've said it. But notwithstanding that, the business of dealing with the landowners arises from dealing with the balance of hardships, which is the third factor, totally different from the irreparable harm aspect of it. But let me ask you on this irreparable harm. You make a big deal out of this senior vice president's testimony, Mr. Cooper, who gets up and says that, well, there's going to be huge delay penalties, $200,000 if we don't do it. But didn't you write the contract? I mean, how do you write a contract and then once you write the contract and create these delay penalties, come back and say we're going to have irreparable harm because we wrote a contract that gives us penalties? How does that work? May I have the time to answer?  You can answer Judge Wynn's question. Thank you. This deals with the issue that's in the briefs as the harm self-inflicted, I think, is the term that the briefs use. I want to know the answer to this question because it seems to me that you wrote it. How strongly are you going to rely on it? Judge Dillon seemed to have relied on it quite a bit, at least of the three judges who looked at it. But how strongly are you relying on that as a basis for your irreparable injury? Because when you look at it in its purest form, it is self-inflicted. You wrote the contract and you created these damages. Now I've got to pay these damages. I say I would do it. I agree to pay it. Well, I would disagree that we created this situation. I think we are following a situation that the courts looked at and determined to be reasonable. I'm only saying you created it because you wrote the contract. Well, certainly we wrote the contracts. But the question is... The damages that arise from the delayed penalties come under the contract that you agreed to. Right. But for that, there would be no penalty. Well, the question was, was it reasonable to enter into contracts like that under the circumstances of getting a FERC certificate but still needing to proceed to district court to seek possession? And the judges looked at that carefully and they found that it was reasonable to enter into contracts like that. That's Judge Dillon at Appendix 1427, Judge Keeley at 201A. And Judge Keeley made an express finding in this case, an express finding, that MVP's decision to set such a schedule was entirely reasonable under the circumstances. So I offer that as a finding of the district judge. Thank you for letting me go over. Ms. Bagnell has some time, I hope. Thank you, Mr. Massey. Ms. Bagnell? Good morning, Your Honors. Nicole Bagnell. Very briefly on the point that Mr. Massey ended on, I would also make the point that while we were a party to the contracts, the contracts needed to be in place in order to make a showing to FERC that the pipeline could be built. And we are just one of the parties to those contracts. And, in fact, there was testimony... What do you call it? A force majeure type clause that says that those could be eliminated, those alleviated, those penalties? I don't believe in the construction contracts with the construction crews, which were the penalties you were referring to. Those construction crews are in high demand. That clause doesn't apply?  But it is a clause that allows you to alleviate contractual penalties. It is, Your Honor. I don't believe that it applied in the circumstances here where there would be a delay in access. And so what Mr. Cooper testified was that because there was high demand for the construction crews at the time that they entered into the contracts, that they had to negotiate those contracts and put in clauses that would provide for payment to the construction crews in the event that there were delays or ultimate cancellation of the project because of the delays. Do you know the answer to my question about why FERC only gives three years on these certificates? Because it does seem like we're ending up with a rule because of this three-year thing. And, as you argue, the district courts did fine given the three-year thing. This is kind of how you have to structure the contract. So we end up with a rule where what is supposed to be the exception, a mandatory preliminary injunction, does seem as though it's going to end up being granted in every case. And it just seems like the tail is wagging the dog a little bit. How come we have to kind of deform the law of equity to accommodate FERC and its three-year certificate? Well, I think that those timelines are put in because of the nature of what the FERC certificate looks at. The FERC certificate looks at whether there is a public need for the project. And if there is a public need for the project, as was found in this case, that the public receive the gas that's transported by the pipeline, then presumably there's a time limit to getting that public good accomplished. People would come in at year nine and say this is ridiculous. You found nine years ago there was a public need, but it's no longer warranted. And the other thing, Your Honor, is that many of the analyses that are done are related in time. You're looking at environmental impacts. You're looking at there's a stalemate. Exactly. Well, Congress could have resolved it if they wanted three years and put in quick take statutorily, could it not? Your Honor, absolutely. They could have put a quick take into the NGA. They didn't. But that doesn't mean that they abrogated the court's rights or the court's jurisdiction under Rule 65 to put a preliminary injunction in place if the four factors are met. Yeah, but that's the thing, though. I mean, that's another underpinning of SAGE in terms of I think vulnerable, too, that you put it in the third branch's court and then you say, yeah, but you've got to do exactly what we want you to do, which we didn't do statutorily. That can't be, can it? Well, I think that the deadline is based on the specific facts of the project first. And so it might not be appropriate to have a statutory requirement of when the project would be done in every single instance. There are many FERC-certificated natural gas pipeline projects that have different time limits on them. But I also think that Congress didn't do anything to abrogate the Rule 65, which allows the court to act in equity as it did here, even if there isn't a quick take provision. I mean, they likewise could have said under the Natural Gas Act or under Rule 71.1 that Rule 65 doesn't apply. And that wasn't done, as the court in SAGE found. That rule and that procedure is still available to the courts. And I think that the SAGE analysis has been the law of this circuit for a little over 14 years, and it's been followed by dozens of district courts, the Third Circuit, the Eighth Circuit, and the Ninth Circuit. And, in fact, there's no new bases or new arguments raised by the landowners that were not raised to the SAGE court. There's also no split amongst the circuits. There was raised in the briefs and also on argument the northern border case. And in northern border, the court required a substantive right. And SAGE addressed that specifically, addressed that northern border case and found that the right was confirmed by summary judgment. That's what happened here. All three district courts looked first to whether MVP was entitled to summary judgment on the merits of this case, on whether or not it had the right to condemn, and found that it was. And it was only after that that it then looked at the four preliminary injunction standards after that substantive right was confirmed. And even the Seventh Circuit cases post-northern border have followed that same procedure as was outlined in SAGE. So discuss the difference there that you bring up, that is that SAGE was actually decided under the Blackwell standard pre-winter. The Supreme Court comes out the winter. Why does that change the analysis? Well, I don't believe that it does, Your Honor. The four factors were fully addressed by the court in SAGE, and they didn't apply a sliding scale. The difference between Blackwell and the real truth of Obama and the subsequent cases is that, in winter, is that the court said you have to look at all four factors. And this was undoubtedly done by these three district courts and actually was done by SAGE. SAGE did not apply any sliding scale. But as Mr. Massey explained, MVP presented evidence on each of the four winter factors, and the courts, all three of the district courts, made numerous findings, none of which can be shown to be clearly erroneous based on all four factors. We had three separate hearings with many hours of testimony and evidence, one in each of the district courts. And this was after written discovery and depositions were taken in the case. The courts independently analyzed each of the factors, and that analysis was rigorous that resulted in over 150 pages of analysis and opinion. And on briefs, the landowners argued that the FERC was some sort of golden ticket, that they were. But, in fact, these were highly contested hearings with multiple witnesses and hours of cross-examination and the submission of additional evidence by affidavit. In terms of the golden ticket theory, is it your position that the district court could have found under the public interest factor that this, could the district court have come out differently on public interest? My understanding is that the argument was, at least as to public interest, the district courts felt themselves bound by the issuance of the FERC certificate. Was that correct? They certainly relied on the FERC certificate the most in that context, and that makes sense because a very thorough analysis was done by FERC. They had that information behind them, and the landowners could not contest or do an end around the FERC certificate at this hearing. They did allow evidence, and so evidence could have been presented on that issue. But I think given the analysis and the very thorough review done by the FERC, that that is the factor where the FERC certificate was most useful to the court in making the analysis. You don't think it was sort of legally dispositive that you could argue to the district court, this pipeline is not in the public interest, without sort of doing an end run around the FERC procedure, saying you can only challenge that in the district court? I think that it would be difficult for the landowner to come up with a challenge that wasn't, to it that isn't in an issue that was not already addressed by the FERC, and thus be making a collateral attack. But it's important to also remember that the landowners, and these landowners in this case did present evidence to the FERC in their analysis. So that same information was available to the FERC when it did its analysis. And I think that the argument that the FERC is a golden ticket ignores the procedural posture of this case. There are only two things that get decided in a condemnation under the Natural Gas Act, the authority for the taking and the just compensation. And we were already through the merits portion. We had summary judgment, and they don't contest summary judgment. MVP was granted the authority for the taking in this case. And it's a very rare preliminary injunction that occurs at this juncture where the merits have been decided. The courts didn't simply say that, well, MVP has a FERC certificate. We must grant them access. As I mentioned before, they went through a rigorous review of all four factors. But isn't the public interest that's being addressed in the preliminary injunction significantly different from the public interest and necessity that FERC determines? That's the ultimate public necessity. If you're dealing with preliminary injunction, you're dealing with the public interest and necessity of immediate possession. Why is that not a significant difference? Well, I think you look at the public necessity of what is occurring. And in this case, what's occurring is the building of a pipeline for the transportation of gas for the public. So I think that it is related. But I think to your point, Your Honor, that to the extent that the landowner should present – It's a different analysis, different type. The term public necessity and convenience is not the same. That's not what they did on the FERC that's applicable here for determining preliminary injunction. I agree with that, Your Honor. But a lot of the same information is relevant because the project as a whole is in the public interest. But what do you think, Judge Wynn, holding on to a very keen point, and that is if the reason for this that's shown has been argued that it has to be done now and irreparable harm, but it doesn't rise to the point where they show that you can't complete it. In other words, if you can complete it within the three-year period you have that, then holding it up for whatever means it is or the court saying you have not met your burden, then that public interest is not touched on necessity, is it? The necessity is the overall FERC was looking at because we need natural gas, right? And now the question is whether or not it would compromise getting this completed. But if you show that, well, no, there are other windows you can do this, then the public interest is a lot narrower, and FERC hasn't looked at that, and there's no evidence that the district courts ever looked at that narrow framework of public interest. I think there is evidence. Show me. Where in the record does it indicate that they looked at the narrow question of whether or not they have met that in the context of, in other words, they're showing this absolutely cannot be built if we don't get it done right now, because that seems to be a moving to 1st of March. When did they do that? Judge Keeley looked at that specific issue in her finding that without preliminary relief, that it would not be able to complete the judicial process and construct the pipeline within the time allotted by FERC. But it seemed like counsel said it's either now or you've got to wait until the end. I mean, isn't there an equity? That's what equity does. You look at what can be done in the gradations. You put it in the third branch court, literally, but then you wanted to have it as if it's some statutory litmus test. All right, FERC says it's a certificate. We get it. But it's not. That's why courts – that's why we're in equity. If I may answer. Certainly. Tell me. I think that the courts looked at that specifically. The landowners presented evidence and were rigorous in their cross-examination regarding the schedule here and whether it needed to be March or it could be November. All of that evidence was before all three of the district courts. They looked not only at is it now or after just compensation, which I think would be the accurate analysis under any circumstances, but in all three district courts, the evidence was presented that there may be an opportunity to complete the project if it began in November. And in all three district courts, they weighed that evidence and they determined that an injunction should issue now, based on looking at that evidence. And the landowners have presented knowing that that's clearly wrong. Not because they found in November could not work. Only because it's inevitable it's going to happen. That's why they said there was no rigorous aspect of why November, no finding of fact then at all. I don't have the site right at my fingertips. But Judge Keeley, I know, addressed exactly that issue and made a finding that the trials would not occur in time for the project to be completed, whether it be March or November. Thank you, Your Honor. Thank you, Bagnell. Mr. Satini, you have some time reserved. I do. Thank you, Your Honor. Before I begin, sort of an abnormal request. Mr. Johns, may we request the court allow him to excuse himself? He is doing a second argument today, which he's up against the time that he expects it to begin in a different courtroom in this building. Yes. Thank you, Your Honor, for that indulgence. I'd like to pick up on the public interest prong because I think that Chief Judge Gregory has hit the nail on the head here. On the FERC certificate saying that it's in the public convenience and necessity, but they gave them until October 2020 to complete it. That's the finding of public convenience and necessity. Is it in the public interest that they get it done sooner? Well, then that should be open to consideration of all the public interest factors. As Judge Wentz noted, this is a much broader consideration. But below, MVP invited the court to make this error by saying, you can't consider any public interest except FERC. FERC has determined it, and any public interest argument that the landowners may make is a collateral attack on the certificate. Can you get us back to the November thing? Yes, ma'am. Because the district courts did find you're not going to be able to complete the pipeline unless we issue a preliminary injunction. There is no way to finish this pipeline within the FERC deadline without a preliminary injunction. So it does seem that under the public interest rubric, it's in the public interest to have a pipeline. It cannot be completed without a preliminary injunction. Fine. But this gets you back to your argument that it ought to have been delayed. The injunction should have issued at the last possible minute. That would allow completion of the project? That's right, that the harm that they presented was not immediate, that the harm would not befall them. The risk of missing the FERC deadline would not befall them until some later time. I think this is a really important question, and I guess the way I thought the district courts were kind of thinking about it is, look, there's going to have to be a preliminary injunction. Whatever harm might come from the sort of abstract idea that you're giving up access to your property before the process is completed, before title changes, that they get to take first, pay later, all of that, that has to happen to finish the pipeline. And, of course, the Supreme Court has said that can happen under Cherokee Nation, so long as it's clear you can, in fact, take first, pay later, so long as it's clear that there will be payment in the end. And the district courts were very careful to make sure they had the right bonds, the right security. Okay, so this is going to happen, not just that the pipeline is going to happen, but there's going to be a preliminary injunction. And at that point, I'm weighing the equities, and if we do the preliminary injunction at the last possible minute, that's going to be a big financial hit for this company. And as I am sort of paraphrasing the district courts, I don't see really inequity on the other side there. And isn't that something? Like, they're the ones who looked at all of this evidence, who parsed all the evidence about the financial harm versus the harm to the landowners. Where's the sort of clear error in the way they weighed those equities? Again, given for a minute, just hypothetically, not only is there going to be a pipeline, or is there going to be eminent domain exercise, but it is, in fact, going to happen before the payment. So, whether it happens a couple of months before the payment or more months before the payment, they're weighing the equities, and they're not seeing the overriding need to make the company suffer these financial consequences. Well, the legal error came by putting on that scale and the balance of the equities, the economic harm, because as a matter of law, that economic harm is not irreparable. There is no holding of this case, of this court, pardon me, that economic harm becomes irreparable simply because it's unrecoverable. I totally don't want to argue with you about that, but I just want to make sure I understand. If I cannot just assume, hypothetically, economic harm, if it can't be recovered at the end of the proceedings could count as an irreparable harm, then what the district courts did here would be okay? Well, I think there are other flaws, as we pointed out in the briefing, that the FERC certificate, the golden ticket theory, that they come... I'm talking, I've sort of walked you through a whole bunch of steps. Okay. So now I'm at a point where there's going to be a... not only is there going to be the exercise of eminent domain, that's conceded, you're not appealing summary judgment, there's also going to be a preliminary injunction because without it, this pipeline can't be built. So the only question is exactly which month should this preliminary injunction be issued? And I'm reading the district courts as saying, well, once we're down to there, I'm kind of looking at the equities and I'm seeing a very big financial hit on one side and nothing on the other side. Is there anything wrong with that analysis other than, and I totally take your point, maybe they shouldn't be looking at economic harms at all? I think the flaw in that analysis would be that they treated the harm to the landowners as completely discounted. I don't agree with Mr. Massey's representation that the landowners were allowed to present any evidence that they wanted. Judge Copenhaver specifically required each law firm to choose a single witness to present harm. We were severely restricted. He believed that presenting evidence of harm from the landowners would be a collateral attack on the FERC certificate. And so to that extent, you know, the landowners' hands were tied behind their backs as far as trying to put something on the scale in their favor. But coming back to the recoverability of non-economic harm, I'm sorry, of economic harm and whether that makes it irreparable loss, the district court for the District of Columbia encounters this all the time, right, because they encounter administrative challenges under the APA where a regulated entity says, this regulation is going to cost me a pile of money. Please enjoin its implementation until we resolve the merits. The DC district courts have recognized that would render these injunctions automatic because even $1 against a sovereign immune defendant is unrecoverable. And so they said that can't be the rule. There must be more to unrecoverability. And that's where the layer of substantial damage threatening the existence of the party comes into play. Even if those DC circuit cases control here, given that they deal with this sort of unique sovereign immunity problem, isn't the standard in DC it has to be a significant financial harm? Well, it has to be substantial or ruinous to the point where it threatens the existence. The DC circuit cases say financially ruinous, I'm going to find that. Air Transport Association versus Import Export Bank. It is a DC district court case. I don't want to mislead the court on which level. It's significant, right, because I did look at those. The DC circuit, I believe the Wisconsin gas case gets that threatening the existence of the business. On the question of whether there were non-economic injuries, I see that I've gone over time. Why don't you finish on one quick point? Thank you very much. On the question of whether there were non-economic injuries shown, I don't think as a matter of law that's correct. The non-economic injury they cite are harms from skip arounds where they have to skip a property and go somewhere else. That is shown in the record to only be a cost to the company and not a – there's no challenge to their schedule. Their contractors are allowed to charge them more, but they're not allowed to ask for more time. The other non-economic harm they suggest is harm to reputation, and we briefed this matter that harm to reputation, goodwill, those are just different species of economic harm under a different name. With that, thank you, Your Honors.
judges: Roger L. Gregory, James A. Wynn Jr., Pamela A. Harris